**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Richard D. McKinnie

     v.                                 Civil No. 07-193-JM

Eddie Nash & Sons, Inc.,
Susan Camille Nash, and
Adam W. Hurd

**O R D E R**

Plaintiff Richard D. McKinnie ("McKinnie") filed a complaint against Eddie Nash & Sons, Inc. ("the company"), Susan Camille Nash ("Nash") and Adam W. Hurd ("Hurd") on June 26, 2007, asserting claims based on, inter alia, common law fraud, breach of contract, and violations of South Dakota's Consumer Fraud Act and New Hampshire's Consumer Protection Act. See Document no. 1. Currently before the court is plaintiff's petition to attach, with notice, filed on July 9, 2007. See Document no. 4. On July 31, 2007, defendants objected to the petition to attach and requested a hearing. See Document no. 11. A hearing on the matter was held on August 15, 2007, after which plaintiff filed a memorandum in support of the attachment. See Document no. 16. Plaintiff seeks to attach real property as well as machinery and equipment in the amount of $125,000. He asserts that there is a

reasonable likelihood that he will recover judgment on his claims, and also contends that defendants' assets will be insufficient to satisfy any judgment in his favor.  As explained below, plaintiff's petition to attach is denied.

<u>Background</u>

Eddie Nash & Sons is a family owned and operated business which buys, sells and trades used forestry, construction, farming and trucking equipment, located in Colebrook, New Hampshire. Nash and Hurd both work for the company.  McKinnie is a self-employed South Dakota rancher.  According to the complaint, in January 2006, McKinnie telephoned defendants after locating a late 1970's "230 Timberjack skidder" advertised on the company's website.[1]  Representatives of the company convinced McKinnie to purchase, instead, a 1990 model year 240 Timberjack skidder, which was "in great shape" and had just come off a job.  Nash sent McKinnie a picture of that unit.  She informed him that the unit would be sold "as-is," which she explained meant it was "woods ready" or "work ready."  Over the next several weeks, Nash and Hurd assured McKinnie the unit would include a new cable, six new chokers, and a good seat, and that it would be "in perfect

_____

[1]A "skidder" is a piece of heavy machinery used in the logging industry to move tree branches and other, similar debris.

2

working order," suitable for his various needs.  McKinnie was persuaded to buy the 1990 skidder.

McKinnie wired Nash $1,000 on March 10, 2006 as a down payment, which defendants' acknowledged was received.  On March 14, 2006, Nash signed an invoice for the sale of a "Timberjack Skidder 240 sn/845068 'Grapple + Winch'," for $30,000, and four new tires for an additional $5,000.  McKinnie did not sign this invoice.  Although defendants were to arrange for shipping the unit to McKinnie, he assumed responsibility for the $2,800 cost of shipping.  After the initial shipping arrangements fell through, Nash proposed an alternative shipping company at an estimated cost of $7,000, which McKinnie declined.  Instead, he arranged the shipping.  On May 5, 2006, McKinnie wired $34,250, the balance due, to the company.

A trucker arrived to pick up the unit on May 12, but left empty-handed because the transmission was not working properly.[2] Finally on June 3, 2006, the skidder was picked up, but rather than driving it up a ramp onto the truck, defendants used a

_____

[2]The parties dispute when the transmission first stopped working and why there was such a delay between the March order and the June shipment of the skidder; however, resolution of those facts is not necessary to resolve the pending motion.  The dispute serves to illustrate the position of the parties, which is at loggerheads on nearly every factual issue.

3

forklift to load the unit.  Nash issued a second invoice that
day, which stated "Took today:  240 Timberjack Skidder, 'Grapple
+ Winch', (4 New Tires) + Chains, sn/845068."  <u>See</u> Complaint,
¶33, Ex. B.

Upon delivery of the skidder in South Dakota, McKinnie
immediately suspected it was not the unit he thought he had
purchased.  He noticed its green color appeared to be painted
over an original orange color, which was the color of older
Timberjack models.  McKinnie called Hurd to question the unit,
but was assured he had received the correct skidder.  Doubting
that, McKinnie then used the serial number to determine that the
unit was actually a 1983 model, rather than the 1990 model
McKinnie had intended to purchase.[3]  McKinnie also noticed that
none of the promised servicing had been performed.  McKinnie
confirmed that the unit was a 1983 model with a local South
Dakota Timberjack dealer, who inspected the skidder and
identified numerous problems with it.  <u>See</u> Complaint, ¶42.  That
dealer conferred with local used equipment appraisers and
concluded the unit was "not worth the cost of needed repairs."

---

[3]Though not significant for purposes of the pending petition
to attach, the parties have presented conflicting evidence about
whether the skidder in fact was a 1983 or 1984 model, rather than
the 1990 model plaintiff thought he had bought.

The skidder was estimated to have a $2,500 salvage value, plus the value of the four new tires.  To date the skidder remains on McKinnie's property.

Discussion

**1.  Standard of Review**

Pre-judgment attachments are available to secure satisfaction of judgments "under the circumstances and in the manner provided by the law of the state where the district court is held."  Fed. R. Civ. P. 64.  Under New Hampshire law, pre-judgment attachments generally may only be issued after notice and an opportunity to be heard have been given to the defendant. See N.H. Rev. Stat. Ann. ("RSA") 511-A:1 and A:2.  At the hearing:

> the burden shall be upon the plaintiff to
> show that there is a reasonable likelihood
> that the plaintiff will recover judgment . . .
> on any amount equal to or greater than the
> amount of the attachment.  Upon satisfying
> said burden, the plaintiff shall be entitled
> to the attachment unless the defendant establishes
> to the satisfaction of the court that his assets
> will be sufficient to satisfy such judgment . . ..

RSA 511-A:3.  The plaintiff's burden of proof to justify an attachment is greater than the preponderance of evidence required to prevail in a civil action.  See Diane Holly Corp. v. Bruno &

5

Stillman Yacht Co., 559 F. Supp. 559, 561 (D.N.H. 1983)
(explaining how New Hampshire's special constitutional protection
of property requires prejudgment attachments to be supported by a
strong preliminary showing of probable success).  "[M]ore than a
favorable chance of success must be shown.. . . [P]laintiff . . .
must make a strong preliminary showing that he or she will
ultimately prevail on the merits and obtain judgment in the
requested amount and that this showing must be established by
proof greater than proof by a mere preponderance of the
evidence."  Id.  Only if plaintiff satisfies this higher burden
of showing a strong likelihood of success does the burden shift
to defendant to demonstrate it has the ability to satisfy the
potential judgment against it.  See id. (affirming order denying
attachment without considering defendant's ability to pay because
plaintiff had not made the requisite showing); see also RSA 511-
A:3.

     Plaintiff was given an opportunity to make the requisite
showing at the hearing on this matter held on August 15, 2007.
Both sides were well represented by counsel, who proceeded by
proffer, including sworn statements and attested pleadings.  They
stipulated to nothing and disputed nearly every issue.  Plaintiff

stressed that the unit was represented as a "woods ready" or "work ready" 1990 model, repaired and in perfect working condition, notwithstanding the "as-is" disclaimer on the invoice.[4]  Defendant countered that an "as-is" condition of a piece of used heavy equipment that was 16 years old necessarily means it is not in "perfect" working condition.  As explained in further detail below, because every point made by plaintiff was met with a strident counterpoint by defendant, the evidence does not point so clearly in plaintiff's favor to justify issuance of a prejudgment attachment at this very early stage in the case.

### 2.  Plaintiff's Likelihood of Success

Plaintiff asserts seven causes of action based on the facts alleged.[5]  Those claims are:

    - Count I:  conspiracy to commit fraud;
    - Count II:  common law fraud;
    - Count III:  violation of S.D.C.I. § 20-10-1;

---

[4]Under New Hampshire law, when the term "as is" is contained in a purchase and sale memorandum, it is understood to mean the item is sold "in its then existing physical and mechanical condition and without warranty as to quality or fitness for a particular purpose."  Johnson v. Waisman Bros., 93 N.H. 133, 136, 36 A.2d 634, 636 (1944).

[5]The complaint inadvertently repeats the number four on two separate counts, so a quick reading of the complaint reflects only six counts; however, on closer review, it is clear that seven causes of action are asserted.

```
                  -  Count IV:   violation of RSA 358-A;
                  -  Count IV:   breach of express warranty;
                  -  Count V:    breach of contract; and
                  -  Count VI:   rescission.
```

<u>See</u> Complaint at 9-14.  The first four counts assert fraud-based
claims against all three defendants; the last three counts assert
contract-based claims against the company only.

Under New Hampshire law, which governs in this diversity
action, <u>see</u> <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487,
496 (1941), to state a claim for fraud, plaintiff must allege
that defendants "'intentionally made a representation with
knowledge of its falsity or with conscious indifference to its
truth with the intention to cause another to rely on it,'" and
that the other justifiably relied on that representation to his
detriment.  <u>M&D Cycles, Inc. v. Am. Honda Motor Co.</u>, 208 F. Supp.
2d 115, 120 (D.N.H. 2002) (quoting <u>Snierson v. Scruton</u>, 145 N.H.
73, 77, 761 A.2d 1046, 1049 (2000) and citing <u>Gray v. First NH
Banks</u>, 138 N.H. 279, 283, 640 A.2d 276, 279 (1994)), <u>aff'd</u>, 70
Fed.App. 592 (1st Cir. 2003).  Plaintiff argues defendants acted
jointly to defraud him by sending a worthless piece of equipment,
and that the statement that the skidder was "woods ready"
justified his decision not to investigate its condition further.
<u>See</u> <u>Jay Edwards, Inc. v. Baker</u>, 130 N.H. 41, 47, 534 A.2d 706,

8

709 (1987) (stating elements of conspiracy to commit fraud)[6];

Univ. Sys. of N.H. v. U.S. Gypsum Co., 756 F. Supp. 640, 651

(D.N.H. 1991) (requiring disclosure of facts peculiarly within

defendants' control); Gilman v. Berry, 59 N.H. 62, 64, 1879 WL

4142 (1879).  Plaintiff also asserts that delivery of the actual

skidder sent breached the contract, the express warranty of being

"woods ready," and the implied warranty of merchantability.  See

Xerox Corp. v Hawkes, 124 N.H. 610, 616, 475 A.2d 7, 9 (1984)

(discussing implied and express warranties that arise under the

Uniform Commercial Code).  Finally, plaintiff argues defendants

violated the Consumer Protection Act in effecting this sale.  See

Milford Lumber Co. v. RCB Realty, 147 N.H. 15, 18, 780 A.2d 1259,

1261 (2001) (explaining how the Consumer Protection Act protects

against the full spectrum of unethical or unscrupulous actions

---

[6]In further support of his conspiracy theory, plaintiff
points to another action against the company which, he argues, is
similar to the facts presented here and demonstrates a pattern of
deception by defendants.  See Putnam Lumber Co. v. Eddie Nash &
Sons, 141 N.H. 670, 690 A.2d 570 (1997).  In that case, Eddie
Nash & Co. sold a 1981 model skidder rather than a 1986 model, as
had been represented.  The plaintiff alleged that the skidder was
not in good condition and required extensive repair.  Defendant
responded by taking back the skidder and trying to recover the
outstanding balance due.  While those facts do resemble the
allegations here, a case from ten years ago does not prove the
facts asserted today.

that can arise in the business or trade context).  In short, plaintiff argues that defendants committed fraud and breach of contract by selling him a different skidder than the 1990 Timberjack model he had negotiated to buy.

At the hearing, plaintiff compared various photographs of the contested skidder to demonstrate that defendants misrepresented material facts regarding the quality and condition of the unit actually sold.  First, plaintiff compared photographs he took of the actual skidder received, see Plaintiff's August 15, 2007 Hearing Exhibits ("Pl.'s Ex.") 4 & 5, with photographs of a skidder which defendants claim depict the unit they sold and shipped to plaintiff on June 3.  See Defs' Mem. in Supp. of Obj. ("Defs' Obj. Mem."), Ex. C.[7]  Plaintiff compared his Exhibits 4 and 5 to defendants' Exhibit C, claiming that the photographs could not be of the same skidder despite defendants' contrary proffer.  Plaintiff identified the following alleged discrepancies:  differences in the paint pattern, specifically around the driver's cage and on the wheels; a sticker on the unit

---

[7]Defendants state the photographs in Exhibit C also were emailed to plaintiff in March 2006, before he agreed to buy the unit; however, plaintiff maintains he never saw these photographs until they were made part of the record of defendants' objection to the petition to attach.

received which is not shown in the photograph of the unit defendants claim to have sent; and an exposed engine in plaintiff's picture while defendants' photograph shows a skidder with an engine covered by a screen.  Plaintiff argued that had he received the photographs in Exhibit C, he would not have agreed to buy the skidder depicted, because of a hole in the grapple. See Ex. C-1 (showing grapple with barely visible hole).

In addition to these superficial discrepancies, plaintiff also stated that the skidder received was functionally deficient: that it only drove in a single gear, the high gear; and that it was filled with enough debris to constitute a fire hazard. Plaintiff represented that because the skidder was inoperable, his damages also included $1,500 in unused diesel fuel, which could not be resold.

Defendants riposted by undermining the identified, alleged discrepancies and challenging plaintiff's general theory that they had deliberately misrepresented what was sold to plaintiff. First, defendants attested that the photographs incorporated into Exhibit C in fact had been sent to plaintiff.  They noted that plaintiff had wanted a grapple, which is considered a luxury and which none of the units originally shown to plaintiff had.  See

Defs's Obj. Mem., Ex. A.  Nash attested that, after further
discussions with McKinnie, she faxed more pictures to show him
units with grapples.  See id., Exs. B & C.  Defendants also
represented that plaintiff knew the skidder had been painted
green over its original orange color, and that plaintiff had
requested additional paint in both colors to cover where paint
had chipped.  Defendants explained that the sticker shown in
plaintiff's exhibits identifies the company, and that all product
that leaves the facility gets labeled with one.  Defendants
further explained that their Exhibit C reflects the old tires,
which were replaced with the new tires that plaintiff purchased
and that are seen in plaintiff's Exhibits 4 and 5.

        Defendants affirmed plaintiff's claim that there was some
confusion over the unit's model year, but clarified that they
also told plaintiff the unit had been repossessed and had just
come off a job.  Defendants maintained that any mistake about the
model year was not deliberate or fraudulent.  Plaintiff was told
the skidder's serial number, which plaintiff could readily have
used to verify the model year of the 240 Timberjack in question.
See Defs' Obj. Mem., Ex. D (March 14, 2006 invoice sent to
plaintiff).  Defendants emphasized that the machinery in question

is "old" and the invoice clearly reads, in what appears to be standard boilerplate language:

> ALL EQUIPMENT IS SOLD BY SELLER AND ACCEPTED
> BY PURCHASER "AS IS."  SELLER MAKES NO
> WARRANTY, EXPRESSED OR IMPLIED, AS TO ANY
> MATTER WHATSOEVER, INCLUDING THE CONDITION
> OF THE VEHICLE, ITS MERCHANTABILITY OR ITS
> FITNESS FOR ANY PARTICULAR PURPOSE.

See id.[8]  Defendants proffered that plaintiff never was assured that the 16-year old, repossessed Timberjack skidder was in perfect working condition.

Nash attested that in response to plaintiff's repeated requests for assurances about the condition of the skidder, she invited plaintiff to come inspect the unit personally, which he declined to do.  Defendants explained that they told plaintiff that the skidder had been driven in the company's yard without incident, that the winch and grapple had been tested and worked, that the transmission had malfunctioned but had been repaired, and that the unit would be serviced before delivery.  Defendants stated that the skidder was not driven onto plaintiff's delivery truck because the truck did not have any ramps, not because defendants were trying to hide how poorly the unit operated.

---

[8]Defendants' copy of the March 14, 2006, invoice conforms with the copy plaintiff attached to his complaint.

Finally, in response to the multiple problems plaintiff listed in the complaint as requiring service, defendant represented that those items could be repaired for only $2,000.  In any event, defendants stated that they had offered to refund plaintiff's money if the skidder were returned to them.

I will not smooth the ice.  As the foregoing amply demonstrates, the proffers are at loggerheads and squarely present credibility issues that cannot be resolved at this preliminary stage in the proceedings.  While an intent to deceive plaintiff may underlie defendants' actions, and defendants may have orchestrated a scheme to defraud an unwary, distant buyer by dumping useless inventory at a handsome profit, as plaintiff would have me believe, defendants' version of the events is also plausible.  The evidence currently before the court is limited to a few photographs, the authenticity of which has not been established, conflicting affidavits of the parties that represent their diametrically opposed stories, and a few invoices.  The evidence is not clearly or convincingly supportive of one position over the other.  Plaintiff's probability of prevailing remains an open question, subject to a more plenary proceeding after discovery has been completed.  Under the circumstances,

14

plaintiff has not met his burden of showing a strong likelihood
of succeeding on the merits of his claims.

### 3.  Defendants' Ability to Satisfy a Judgment[9]

Plaintiff concludes that, notwithstanding the defendants'
claim of solvency, they have not carried *their* burden of showing
the ability to pay a money judgment.  They have made no
representations as to cash on hand, nor that the $500,000 equity
in the real estate is unencumbered.  Plaintiff also points to
pending criminal charges against defendant Nash, to substantiate
his overall theory of deception and bolster his concern about
defendants' inability to satisfy a judgment against them.[10]
Plaintiff emphasizes that he does not seek attachment out of ill
will, which representation I found credible.   Indeed plaintiff

---

[9]Though further analysis is not warranted under RSA 511-A:3
since plaintiff did not meet his burden of proof, because both
parties proffered arguments in support of their position on the
sufficiency of defendants' assets to satisfy any potential
judgment, I will address the issue.

[10]Plaintiff argues that recent state indictments against
Nash on charges of forgery and theft by deception suggest that
the defendants are experiencing financial difficulties.  The
defendants deny the indictments reflect Nash's character or
finances, noting that they stem from a retaliatory claim made by
a debtor of the company, in reaction to a civil lawsuit filed
against the debtor to collect an unpaid sum due.  Defendants
proffer that the county attorney has agreed to drop all charges.

agrees that if an attachment ensues, it should be limited to real property so as not to interfere with defendants' business.  If, however, the court finds defendants have sufficient assets to cover a likely judgment for plaintiff, plaintiff also asks the court to find that any transfers of assets after the denial of an attachment would be subject to the provisions of the Uniform Fraudulent Transfer Act.  See RSA 545-A:4 (addressing fraudulent transfers as to present and future creditors).

Defendants proffered credible representations that they would have no difficulty paying a judgment in this case, because they have more than sufficient equity in real property and chattels to satisfy any potential judgment against them.  I find the defendants' verified memoranda both important and persuasive. The attested proffer that the company has $500,000 in equity, and that sales for 2005 were about $5,000,000, demonstrate that defendants have sufficient assets to satisfy a judgment in this matter.  Had the defense proffer been weaker, and had the defense not directly addressed plaintiff's arguments, the resolution of this provisional remedy might well be different.  The defendants' firm statement of the company's asset value, however, is not contradicted by plaintiff except with conjecture and speculation.

Accordingly, even if plaintiff had met his burden of proof on the merits, a prejudgment attachment of defendants' assets is not warranted under the circumstances as they stand now before the court.

Defendants, nevertheless, are placed on notice that this is a provisional remedy, subject to being revisited under appropriate circumstances, and the court would look askance at the transfer or encumbering of assets which might cause concern with the court or plaintiff.  While the provisional remedy has been denied, the defendants are to notify the court of any intention to encumber or transfer real property or chattels, except as is necessary in the ordinary course of business, otherwise such an action might be looked upon as an attempt to avoid a future adverse judgment, and might prompt appropriate remedial steps to be taken at that time.

<u>Conclusion</u>

For the reasons set forth above, the Court finds that plaintiff has not made the strong showing that he will prevail on his claims needed at this preliminary stage to justify issuance of a prejudgment attachment.  Moreover, even if plaintiff had made the requisite showing, defendants have established to my

satisfaction that they hold assets which are sufficient to satisfy a judgment of this court, with interest and costs. Therefore, the motion for prejudgment attachment (document no. 4) is denied.

      **SO ORDERED.**

                /s/ Justo Arenas
                Justo Arenas
                United States Magistrate Judge

Date: August 24, 2007

cc:  Zachary Gates, Esq.
     William Pribis, Esq.

18